UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X

DIAMOND JEWELS,

                Plaintiff,

                                       **MEMORANDUM AND ORDER**

     -against-                   15-CV-5760 (KAM)(ST)


ADOLOFO LEWIS, CECILIA ELLIS, DIREN
O'BRYAN, HEARTSHARE HUMAN SERVICES OF
NEW YORK; MARK CASNER, GLORIA
ANTONSANTI, MARIBEL CRUZ, JENNIFER
FORTE, VALERIE RUSSO, individually and
as deputy Commissioner, and THE CITY OF
NEW YORK,

                Defendants.

--------------------------------------X

**MATSUMOTO, United States District Judge:**

        On March 10, 2017, plaintiff Diamond Jewels

("plaintiff" or "Jewels") filed a fourth amended complaint

against defendants the City of New York ("the City"), Mark

Casner, Gloria Antonsanti, Maribel Cruz, Jennifer Forte, Valerie

Russo, Heartshare Human Services of New York ("Heartshare"),

Adolfo Lewis, Cecilia Ellis, and Diren O'Bryan, bringing claims

pursuant to 42 U.S.C. § 1983 and asserting additional state law

claims under 28 U.S.C. § 1367.  ECF No. 81, Fourth Amended

Complaint.

        Plaintiff claims nine separate causes of actions

against the defendants: (1) that defendants violated plaintiff's

personal security while plaintiff was in government custody by failing to supervise plaintiff properly while she was in foster care in violation of the Fourteenth Amendment; (2) that defendants failed to properly train their city and foster care employees in violation of the Fourteenth Amendment; (3) that defendants acquiesced in the use of excessive force against plaintiff, in violation of the Fourth and Fourteenth Amendments; (4) that defendants failed to exercise the highest degree of reasonable care during their supervision of plaintiff by failing to protect her from abuse and failing to provide her with adequate food, clothing, shelter, and funds; (5) that Heartshare breached its contract with the City, of which plaintiff was a beneficiary; (6) that the defendants departed substantially from the standards of conduct of their profession; (7) that defendants restricted plaintiff's contact with her brother and sister while they were residing in different foster homes; (8) that the defendants failed to remit funds to plaintiff for school, in violation of the Fourteenth Amendment; and (9) that defendants retaliated against plaintiff for commencing this litigation, in violation of the First Amendment.

After stipulations by the parties, the only claims remaining are the first six causes of action against the City and Russo (collectively "City defendants") and Heartshare, Lewis, and Ellis (collectively "Heartshare defendants").

Pending before the court are plaintiff's motion for partial summary judgment; the City defendants' motion for summary judgment, and the Heartshare defendants' motion for partial summary judgment. For the reasons set forth below, the court denies plaintiff's motion, grants in part and denies in part the City defendants' motion, and denies the Heartshare defendants' motion.

**BACKGROUND**

## I. Factual Background

The facts in this section are taken from the plaintiff's Rule 56.1 statement (ECF No. 151), the defendants' joint Rule 56.1 statement (ECF No. 136), plaintiff's additional Rule 56.1 statement (ECF No. 155), the parties' responses to the 56.1 statements (ECF Nos. 137, 138, 155), and the parties' declarations and exhibits in support of those statements. The facts are considered in the light most favorable to the non-moving party.

### A. ACS & Agency Providers

The Administration for Children's Services ("ACS") is an agency of the City of New York responsible for protecting children from harm, a task accomplished by investigating reports of suspected child abuse, maltreatment, or neglect. ECF No. 136, Joint Defendants' Local Rule 56.1 Statement ("Defs. 56.1") ¶ 6. When children are removed from the homes of their natural

parents, the City contracts with private child care
organizations ("contract agencies"), such as defendant
Heartshare for the provision of foster care services. *Id.* ¶ 7.
The standards an agency must abide by in caring for foster
children are included in contracts between the agency and the
city. *Id.* ¶ 36. ACS has promulgated and maintains voluminous
regulations which articulate the standards, policies, and
procedures by which contract agencies and ACS employees are
expected to abide to ensure the safety of children in foster
care. *Id.* ¶ 35. ACS provides additional guidelines setting
forth requirements with respect to the general supervision of
foster children by contract agencies. *Id.* ¶ 48.

ACS has a division that is specifically dedicated to
investigating reports of neglect, abuse, and maltreatment of
foster children in foster homes. This division is currently
known as the Office of Special Investigations ("OSI"). *Id.* ¶
31. After an investigation, if OSI determines that credible
evidence was not discovered during the investigation to support
the allegations, OSI will deem the report unfounded; if there is
credible evidence that the allegations could be true, the report
will be "indicated." *Id.* ¶ 32.

Agency Program Assistance ("APA") is an office within
ACS which was, and still is, responsible for working with each
contract agency to monitor and improve contract agency casework

practices on a broad level. *Id.* ¶ 33. APA monitors meet with contract agencies regularly to discuss and work to improve performance issues agencies have. *Id.* ¶ 90. APA monitors track the ability of agencies to assess the safety of foster homes, and monitors consider the number and type of indicated cases an agency has had in a given year when monitoring overall agency performance. *Id.* ¶¶ 92-93.

APA staff members review certifications of indicated cases of abuse or neglect, which are an agency's written explanation of its responses to indicated cases, to determine whether the actions taken by an agency in response to an indicated case were prudent, meaning that the actions were responsive to the safety issues raised in the substantiated case. *Id.* ¶ 94. If the APA staffer reviewing the certification deemed that the agency's action was not prudent, APA would contact the agency to inquire about additional follow-up actions and reassess whether those follow-up actions were prudent. *Id.* 95.

Prior to December 15, 2008, the Office of Contract Agency Case Management ("OCACM") was an ACS office that oversaw and monitored contract agencies through review of mandatory paperwork such as Family Assessment Service Plans ("FASP"). *Id.* ¶ 14. Prior to the implementation of an initiative called Improved Outcomes for Children ("IOC"), which was publicly

announced on March 21, 2007, ACS employees in OCACM, Adoption
Case Management ("ACM"), and APA monitored and supervised
contract agencies. Defs. 56.1 ¶ 61; ECF No. 152-64, Pl. Ex. 64
at ACS 002555. APA assisted with the pre-IOC monitoring and
supervision of contract agency performance by conducting
performance evaluations known as EQUIP. Defs. 56.1 ¶ 72. IOC
replaced the functions of OCACM, and the latter ceased to exist
in 2008. *Id.* ¶ 73. IOC was a system-wide reform that aimed to
strengthen quality assurance for contract agencies generally and
APA particularly. *Id.* ¶ 74.

In approximately 2007, ACS transitioned from using the
EQUIP evaluations to yearly evaluations known as Scorecards.
*Id.* ¶ 81. Scorecards evaluate the overall performance of
contract agencies by measuring factors related to safety,
permanency, well-being, and foster parent support. Defs. 56.1 ¶
82; *see, e.g.*, ECF No. 152-38, Pl. Ex. 38, Heartshare Scorecards
2008-2011. The Scorecards give letter grades (A through F) to
agencies on various aspects of each agency's performance,
including protecting foster children from abuse. Pl. 56.1 ¶ 99.

The Scorecard process involves a review of a sample of
each contract agency's case records by an ACS Provider Agency
Measurement System (PAMS) unit for the purpose of evaluating the
casework of contract agency staff. Defs. 56.1 ¶ 83. If a PAMS
reviewer notices anything during a case record review that

raises a concern or a safety risk with respect to a particular child, the reviewer should issue a safety alert. *Id.* ¶ 84. The safety alert is sent to both the APA monitor and the contract agency itself, and the agency must address the situation within forty-eight hours. *Id.* ¶ 85.

Unsatisfactory performance on a Scorecard could result in placement of a contract agency on one of several heightened monitoring statuses or the closing of intake at the contract agency, which would mean that no additional foster children could be placed there. *Id.* ¶ 88. A contract agency's failure to improve its performance over time could result in the contract with the City being terminated or reduced. *Id.* ¶ 89.

B. Plaintiff's Placement in and Conditions of the Shore Residence

Plaintiff was placed in foster care on May 7, 1997. ECF No. 151, Plaintiff's Local Rule 56.1 Statement ("Pl. 56.1") ¶ 47. The foster care was managed and supervised by the City through ACS. *Id.* She was placed in the care of Concord Family Services ("Concord") foster care agency, and she remained under Concord's supervision until the City ultimately terminated Concord's contract and the agency closed. Pl. 56.1 ¶¶ 48-49.

On December 15, 2008, with the City's approval, 16 children, including plaintiff and her brother, were transferred from Concord to Heartshare. ECF No. 155, Plaintiff's Additional

Local Rule 56.1 Statement ("Pl. Supp.") ¶ 195; Defs. 56.1 ¶ 5.
Plaintiff lived in the home of Dolores Shore at the time her
case was transferred from Concord to Heartshare.  Defs. 56.1 ¶
105.  Plaintiff had been placed into the home of Dolores Shore
by Concord and ultimately lived there until June 1, 2010, with
the exception of a transfer to two other foster homes between
January 2017 and May 2017.  Pl. 56.1 ¶¶ 167-68.  Shore's two
sons, Max and Kyle, lived in the home when plaintiff was
transferred to Heartshare.  Pl. 56.1 ¶ 170.  While plaintiff
lived in the Shore home, Kyle was arrested and charged with
armed robbery.  *Id.* ¶ 176.  Shore reported to Heartshare on
February 6, 2009 that Kyle did not reside in the home because he
was incarcerated and had been so since January 2008.  *Id.* ¶ 178.
He was released on August 2009.  *Id.* ¶ 180.

 Shore testified in her deposition that Kyle nominally
lived in her house or was listed as living in her house after he
was released, but that he actually stayed at his girlfriend's
home.  ECF No. 158-28, Dolores Shore Deposition Transcript
("Shore Tr.) 30:5-16.  However, she also testified that Kyle was
required to live in her home as a term of his probation.  Shore
Tr. 37:2-4, 21-23.  Shore testified that she took Kyle to
Heartshare when he was released from prison in August 2009 "to
report that he was out of jail . . . [and because] [h]e was
living in my home."  Shore Tr. 40:16-23.  On August 26, 2009,

Kyle signed an addendum to the Heartshare foster parent agreement stating that he was a "member of [the] household" who had been "convicted of any crime." ECF No. 152-21, Ex. 21 at 3797. Shore subsequently reported to Ellis, plaintiff's Heartshare caseworker, on January 28, 2010 that "her sons moved out of her home." ECF No. 152-25, Ex. 25 at ACS-DJ-00407.

Plaintiff testified at her deposition that Kyle Shore sexually abused her while she was in the Shore household, both before and after her case was transferred to Heartshare. ECF No. 158-21, Diamond Jewels Deposition Transcript ("Jewels Tr.") 20:10-15. Prior to the transfer, he would (through his clothing) rub his penis against plaintiff's feet, touch himself while sitting next to her on the couch, and feel her legs. *Id.* 20:14-25. Plaintiff did not tell her prior caseworker at that time about the abuse, but told her subsequent caseworker, Ellis, about the abuse after Kyle was released from prison and the abuse got worse. *Id.* 21:5-17.

Plaintiff testified that she told Ellis about the current and prior abuse. *Id.* 22:14-23. She testified that Kyle would masturbate in front of her, ask her to perform oral sex, grab her, and expose his penis to her. *Id.* 23:6-16. She also testified that when she reported this behavior to Ellis, Ellis told her, outside of Shore's presence, that the Shore home was the best foster home plaintiff would ever be in and that she

should not complain because there were worse homes. *Id.* 23:20-24:4. From January 2009 through May 2010, Heartshare caseworkers visited the Shore home monthly, except for the months of January 2009, April 2009, July 2009, and October 2009. Def. 56.1 ¶ 108; ECF No. 155, Plaintiff's Response to Joint Defendants' Local Rule 56.1 Statement ("Pl. Response to Defs. 56.1") ¶ 108. Ellis's case notes do not reflect plaintiff's complaint regarding Kyle. ECF No. 137, Joint Defendants' Response to Plaintiff's Local Rule 56.1 Statement ("Defs. Resp. to Pl. 56.1") ¶¶ 186-188.

Plaintiff also testified that Dolores Shore emotionally abused her, though Shore denied doing so during her deposition. Jewels Tr. 24:20-25:2; Shore Tr. 25:20-22. Plaintiff did not, however, ever complain about this to her caseworker. Jewels Tr. 25:6-8. Plaintiff testified that Shore's daughter and her three granddaughters attacked her, which caused her to leave the home. *Id.* 31:22-32:16. Plaintiff stated that Ellis knew about this attack and that she, her brother, and Shore had called Ellis about it. *Id.* 32:19-33:2.

Dolores Shore requested that plaintiff be removed from her home because she believed that plaintiff had stolen a cellphone from her. Defs. 56.1 ¶ 120; Pl. Resp. to Defs. 56.1 ¶ 120. Plaintiff was removed from the Shore home and placed in the home of Gary Hoyte ("Mr. Hoyte") on June 1, 2010. Pl. 56.1

10

¶ 198.  Plaintiff then reported that she had been abused by Kyle Shore in or about August 2009.  Defs. 56.1 ¶¶ 121-22.  On June 1, 2010, a report was made to the State Central Register Child Abuse hotline stating that Kyle Shore, age 21, had been "touching [plaintiff] age 15 on the legs and masturbating in front of her" and that he had "also . . . been asking [plaintiff] to perform oral sex on him."  ECF No. 152-36, Ex. 36 at ACS-DJ-000732.  Plaintiff "told the foster mother Dolores [Shore] of the sexual abuse" and "Dolores called [plaintiff] a liar and took no action."  *Id.* at ACS-DJ-000735.  Shore testified at her deposition that plaintiff was never alone in the house with Kyle.  Shore Tr. 29:20-23.

On June 2, 2010, plaintiff needed to be taken to the police station to be interviewed regarding her allegations against Kyle Shore.  Pl. Supp. ¶ 302.  A CPS worker reported that Ellis "refused to go to the school to pick up [plaintiff]" to take her to the police station.  Pl. Supp. ¶ 303. Regardless, plaintiff was interviewed on that day, and one of the police detectives who interviewed her about the allegation told CPS that "masturbating in front of a child is inappropriate[,] but because [Kyle] did not touch [plaintiff's] breast, butt, or vagina[,] no sexual crime was committed."  Ex. 36 at ACS-DJ-000742.  The detective further stated that Kyle was already in jail for another offense, so he would not pursue

11

plaintiff's case and the case would be closed the same day.  *Id.*
Plaintiff's complaint was subsequently deemed unfounded.  ECF
No. 152-7, Ex. 7.

### C. Placement in and Conditions of Hoyte Residence

While plaintiff resided in the Shore residence, her
brother Cyris lived in the household of Gary Hoyte and Dadirai
Kapasura (frequently referred to throughout the case files as
"Dee" or "Dadirai Hoyte"), Gary Hoyte's live-in girlfriend and
the mother of two of his children.  Pl. 56.1 ¶¶ 2, 203, 209.

Six days after plaintiff and her brother were
transferred to Heartshare from Concord, Heartshare recertified
Mr. Hoyte as a foster parent before meeting with him and without
access to any of Concord's records or records in the Connections
database, the database in which agency employees were required
to record their case notes for each foster child.  Pl. 56.1 ¶¶
152, 255.  The City caseworker assigned to a foster child has
contemporaneous access to and is supposed to read all entries in
the Connections database system which have been made by the
agency caseworker.  Pl. 56.1 ¶ 396.

During the first Hoyte home visit by anyone from
Heartshare, on December 30, 2008, the home was observed to be
"inappropriate due to several holes in the walls," including a
large hole in the wall in Cyris's bedroom.  Pl. 56.1 ¶ 256.
Plaintiff's Heartshare case planner, Owen, observed the Hoyte

12

house on February 26, 2009 and noted the home was "in need of many improvements.  There are holes in the walls of the stairwell and hallway, as well as in the [foster children's] bedrooms. . . . [Owen] asked to see the fire alarm and carbon monoxide detector and the foster parent pulled it out of a drawer. . . . The cabinets seemed to have very little food. . . . The freezer had one or two frozen packs of meat, and was filled with ice and frost."  Pl. 56.1 ¶ 269.

Mrs. Hoyte did not know where the fire alarm and carbon monoxide detectors were during a visit on March 25, 2009, though Owen also reported that the home was "free of safety factors/hazards."  Ex. 35 at ACS 000417.  When a Heartshare caseworker next visited the household three months later on June 24, 2009, she reported that the alarm and detector were working, there was adequate food in the home, and there were no present safety/risk factors in the home.  *Id.* at ACS 000422.

On September 9, 2009, Heartshare reauthorized Gary Hoyte as a foster parent, but left blank a question about the physical condition of the Hoyte home on the reauthorization form.  Pl. 56.1 ¶ 273.  On November 23, 2009, Heartshare caseworker Ellis observed that the bannister on the staircase was defective and Mrs. Hoyte admitted that it needed repairs.  Pl. 56.1 ¶ 274.  On April 28, 2010, a Heartshare home evaluation for the Hoytes noted that the home was cluttered and that the

Hoytes did not provide the children with clothing or allowances. Pl. 56.1 ¶ 275.

On June 1, 2010, plaintiff was transferred to the Hoyte residence. Defs. 56.1 ¶ 137. That same day, Cyris told Ellis that he did not have a good relationship with the Hoytes and felt that they did not care about him. Pl. 56.1 ¶ 277. At her deposition, plaintiff testified that she told Ellis that she did not want to live in the Hoyte home because of the living conditions, but she was told by Ellis that Mr. Hoyte had agreed to take her already and that there was no other home for her. ECF No. 158-21, Diamond Jewels Deposition Transcript ("Jewels Tr.") 51:15-52:3. Ellis's case notes, however, state that Diamond reported she was happy to live in the same home as her brother and that she did not want to be in a home where she did not know the family. Ex. 25 at ACS-DJ-000439. Plaintiff was supposed to share a bedroom with another foster child, Louis, at the Hoyte home, but instead shared a bed with Cyris and Cyris's girlfriend, when she actually slept in the Hoyte home, because Cyris did not want her to share the room with the other foster child. Jewels Tr. 53:23-54:20.

On June 7, 2010, based on a review of the Connections notes, the City issued a safety alert to defendants Lewis, Ellis, and Heartshare due to the lack of a smoke detector on the Hoytes' second floor. Pl. 56.1 ¶ 296. These safety alerts are

issued when the City workers are reading a case file and come across something "so egregious or scary or . . . a lack of documentation." Pl. 56.1 ¶ 297. On July 7, 2010, Heartshare reapproved the Hoyte residence. *Id.* ¶ 298.

Plaintiff testified that "there was no food ever" in the household. Jewels Tr. 55:23-24. She stated there were mites and fleas in the couch, mice and rats in the home, and mold in the bathroom and around the house. *Id.* 55:24-56:3; 57:10-11. Plaintiff said there were rats and roaches everywhere, including the kitchen, living room, and dining room. *Id.* 57:4-11. She said they received many infections from the mold. *Id.* 56:3.

Plaintiff also testified that Gary Hoyte was sexual toward her, holding her arms and making flirtatious comments to her when she visited Cyris before moving in to the Hoyte household herself. *Id.* 56:9-14. His behavior got worse when she moved in. *Id.* 56:14-16. He would sit in tight underwear on the couch and try to make girls in the home sit on his lap. *Id.* 56:17-23. He never exposed his penis to plaintiff however. *Id.* 59:21-60:5.

Plaintiff testified that she did not receive allowance, new clothes, or meals from the Hoytes. *Id.* 60:22-61:9. She claims that she told Ellis that she was not receiving food, as did Cyris. *Id.* 61:10-13. Plaintiff reported that she

was AWOL most of the time she was with the Hoytes. *Id.* 57:15. She would engage in sexual activities outside the Hoyte home for food and money, and then stay at the homes of the participants in those sexual activities afterward. *Id.* 57:20-58:4. Ellis's case notes indicate that she asked plaintiff on July 13, 2010 where plaintiff received money from, but plaintiff told Ellis "that she did not wish to disclose how she receive[d] her funds" and "indicated that she receive[d] funds from [Mrs. Hoyte] and other people." Ex. 25 at ACS-DJ-000446. Mrs. Hoyte indicated to Ellis that she was not sure where plaintiff was receiving money and "state[d] that she believe[d] that [plaintiff was] prostituting." *Id.*

Plaintiff testified that she told Ellis that she was sleeping in other places, including New Jersey, Long Island, the Bronx, and Brooklyn. Jewels Tr. 58:13-22. She did not tell Ellis that she was having sex with the individuals she was staying with. *Id.* 58:23-59:1. According to plaintiff, Ellis never asked what she was doing. *Id.* 59:4. Plaintiff would go by the Hoyte household during the day, but believes that she only stayed the night there for the first two weeks of her placement. *Id.* 60:13-22. The Hoytes did not notify Heartshare that plaintiff was not remaining in the home. Defs. 56.1 ¶ 142.

Plaintiff asked Ellis to make unannounced visits to see the condition of the house and understand why plaintiff was

16

not staying there.  Jewels Tr. 59:5-13.  When plaintiff asked to
be relocated and was told by Ellis that there was no other place
to stay, she informed Ellis that she would continue to be AWOL.
*Id.* 59:17-20.  During the deposition, plaintiff recognized
photos of the Hoyte home and confirmed that the conditions
depicted in them were consistent with what she experienced while
living there.  *See generally id.* at 63-71; ECF No. 152-3, Ex. 3.

### D. Investigation into the Hoyte Home

On August 5, 2010, an unidentified person reported to
the New York State Central Register of Child Abuse and
Maltreatment that Gary and Dadirai Hoyte had mistreated
plaintiff by failing to notify Heartshare that she had
disappeared a week earlier, that the Hoytes had left their
foster children unattended, and that Gary Hoyte behaved
inappropriately with the female foster children, including
slapping them on their buttocks.  Pl. 56.1 ¶ 299.  Based on
those allegations and plaintiff's indication that she did not
feel safe at the Hoyte home and wished to be removed from the
Hoyte home, Heartshare moved plaintiff to a new foster home on
August 5, 2010.  *Id.* ¶ 300.

On August 5, 2010, OSI began an investigation which
ultimately resulted in the plaintiff being removed from the
Hoyte home.  Defs. 56.1 ¶ 139.  An investigator from ACS

17

recorded the following during a visit to the Hoyte household on
August 5, 2010:

> [H]oles in the wall and a dining table that
> had ants crawling on it. . . . There were also
> ants in the kitchen as well. [Investigator]
> had a baby roach crawling on [Investigator's]
> black book while taking notes. . . . The sink
> was filled with dirty dishes. . . . The door
> to Cyrus' [sic] room was broken. . . .
> [Investigator] asked Mrs. Hoyte why there were
> holes in the walls and she stated that she did
> not even know that they were there. . . . Next
> to Cyrus's [sic] room was [name redacted] and
> Diamond's room. The walls in this room were
> filthy. The floor was filthy as well. The
> floor looked as if it had not been mopped in
> years. . . . [Investigator] observed the
> bathroom to have little bugs, [Investigator]
> could not distinguish whether they were ants
> or roaches.

ECF No. 152-1, Ex. 1 at ACS 0016340-41. Although
Ellis had previously visited the household on the same date, her
notes do not reflect any of these conditions. *See* ECF No. 152-
35, Ex. 35 at ACS 000148-49.

On August 6, 2010, plaintiff told the ACS investigator
that Mr. Hoyte was a pervert, that he had made sexual advances
to her, her girlfriend, and her brother's girlfriend, that Mr.
Hoyte slapped her on the buttocks, and that he had asked her to
meet him at a motel. Pl. 56.1 ¶ 306. Diamond's girlfriend and
Cyris's girlfriend confirmed to the investigator that Mr. Hoyte
had made advances to them. *Id.* Plaintiff also told the

investigator that she did not report any of the concerns because she had freedom to do whatever she wanted in the home. Defs. Response to Pl. 56.1 ¶ 306. However, plaintiff testified at her deposition that she had told Ellis that she did not want to be relocated to the Hoyte home because of conditions there, and that she told Ellis she was not staying at the Hoyte home for those reasons. *See, e.g.*, Jewels Tr. at 51:15-52:3; 58:13-22; 59:5-13; 59:17-20.

Plaintiff reported that she stayed out of the home and was rarely there. Pl. 56.1 ¶ 307. She testified at her deposition that she would trade sexual favors for food and a clean place to sleep because the conditions at the Hoyte home were so bad. Pl. 56.1 ¶ 308.

On August 9, 2010, the ACS investigator reviewed available home finding records on the Hoyte home and recorded in her report: "The home was noted to be substandard [in 2005] and at recertification in November 2008. The same conditions noted in the home in 2008 [were] observed by [investigator] this month. It appears that the conditions of this home were not addressed by either [Concord or Heartshare]. . . . The conditions of this foster home [are] unacceptable." Pl. 56.1 ¶ 311. On August 10, 2010, the investigator noted that the "[Hoyte] foster home is in very poor condition. This home has been in this condition for years as it was [documented] in a

home assessment from Concord Agency in 11/2008[.]  The home has holes in the walls, ants, roaches, and the bedroom for the foster children girls was filthy."  Pl. 56.1 ¶ 9.  At a conference with CPS on August 13, 2010, Cyris "submitted photographs . . . in which the holes in the walls, a mouse in the sink, and other poor conditions of the home were depicted." Ex. 1 at ACS001055; *see also* Ex. 3 (depicting these conditions).

The November 24, 2008 home assessment noted that there were multiple holes in the walls and doors, including by the front door, the dining area, the kitchen, and Cyris's room.  Pl. 56.1 ¶¶ 229-230.  The 2009 home study, which had an authorization date from December 30, 2009 to December 30, 2010, contains the same "home study narrative" that was conducted on September 22, 2005 by Concord.  ECF 141-18, Ex. Z at 3023-3032; *see also* ECF 152-19, Ex. 19 (the 2005 narrative).  Although there is an annual reauthorization narrative dated September 9, 2009, the narrative does not provide a response to the question regarding the "physical condition of the home," which would address "a need for repairs" and "smoke detector[s] and their locations."  Ex. Z at 3037.

Heartshare's annual authorization form on December 30, 2009 reflects that the last State Central Register database check on the Hoytes was conducted on September 4, 2005, more than four years before the reauthorization date.  Pl. 56.1 ¶

315.  Heartshare never conducted a State Central Register database check for the Hoytes when they received the home from Concord in 2008 through at least the end of 2009, and did not conduct a new State Central Register database check as part of the reauthorization.  *Id.* ¶ 316.  On August 12, 2010, the ACS investigator's supervisor noted that an SCR search on the Hoytes had revealed 7 prior cases, which were all unfounded.  ECF No. 152-1, Ex. 1 at ACS-0016376.  The supervisor stated that "[t]his history raises a red flag in reference to parents['] ability to appropriately care for children in their home, although cases were unfounded."  *Id.*

On September 10, 2010, a Foster Boarding Home Replacement Review was held regarding the incidents of abuse and neglect of plaintiff and other children who had been placed in the Hoyte foster home.  Pl. 56.1 ¶ 326.  Defendant Lewis, Mrs. Hoyte, the OSI investigator, and two additional Heartshare employees attended the meeting.  *Id.* ¶ 327.  In her final decision, the Foster Boarding Home Replacement Reviewer noted that she had "serious concerns regarding the report made of Mrs. Hoyte's husband's inappropriate gestures towards the former female foster children that were placed in the home."  *Id.* ¶ 329.  The reviewer felt that the placement of children into the Hoyte home "would not be in their best interest safety, welfare, or well-being."  *Id.* ¶ 330.  The reviewer recommended that the

Hoyte home remain closed and that no other foster children should be placed there.  *Id.*

On September 24, 2010, ACS substantiated the allegation of sexual abuse and maltreatment, inadequate guardianship, and lack of supervision against Gary Hoyte.  Pl. 56.1 ¶ 331; Defs. 56.1 ¶ 148.  This included a finding that the Hoytes "continuously allowed [plaintiff] to remain away from the home for extended periods of time without knowledge of her whereabouts."  Ex. 1 at ACS001150.  "The overall quality of care provided to all of the foster children in the home was substandard [and] [t]he conditions of the home were also substandard as well."  *Id.*  Mrs. Hoyte encouraged and gave permission to plaintiff and another foster child to perform oral sex, and Mr. Hoyte "repeatedly invited [plaintiff] to meet [him] at motels and also to have [group sex] with him."  *Id.*  ACS recommended that the Hoyte home be closed immediately.  Pl. 56.1 ¶ 332.  The indicated report regarding plaintiff does not appear in Heartshare's certification for the period of "January to December 2010."  Ex. 1 at ACS-DJ-015873-889.

ACS also requested that Heartshare assign a new case planner to plaintiff, after Ellis told plaintiff to "shut up" in the middle of a conference.  *Id.* 333.  This occurred months after an ACS Child Protective Supervisor had reported in her case notes on June 8, 2010 that a conference needed to be

scheduled with Heartshare, noting that Heartshare had failed to bring plaintiff to the police station for her interview regarding the Kyle Shore allegations or shown up to the interview to support her.  ECF No. 152-61, Ex.61 at ACS-DJ-000756.  The ACS supervisor asked in her case note, "Why are they not being supportive of this child?"  *Id.*

### E. Claims and Instant Litigation

The parties previously stipulated to dismiss with prejudice Concord and a variety of other parties from this litigation and to dismiss with prejudice claims accruing on or before December 15, 2008 as to defendants the City of New York, Mark Casner, Gloria Antonsanti, Valerie Russo, Jennifer Forte, and Maribel Cruz.[1]  ECF No. 77, Feb. 17, 2017 Stipulation & Order of Partial Dismissal with Prejudice.  After the parties served their opening briefs, the plaintiff subsequently stipulated to dismiss with prejudice: (1) claims against defendants O'Bryan, Antonsanti, Cruz, Casner, and Forte; (2) claims brought under the seventh cause of action in the Fourth Amended Complaint regarding sibling visitation; (3) claims brought under the eighth cause of action in the Fourth Amended Complaint regarding

---

[1] Throughout the parties' Local Rule 56.1 statements, defendants object to the citation of facts occurring prior to December 15, 2008.  Although the stipulation prevents these facts from serving as an independent cause of action, they are relevant for establishing what information was available to the parties later in time and whether that information could have (or should have) influenced decisions made after December 15, 2008.

payment of college expenses; and (4) claims brought under the ninth cause of action in the Fourth Amended Complaint regarding retaliation.  ECF No. 132, Nov. 20, 2008 Stipulation & Order of Partial Dismissal.

Plaintiff's remaining claims consist of the first six causes of action in her Fourth Amended Complaint against the Heartshare defendants (Heartshare, Lewis, and Ellis) and the City defendants (the City of New York and Russo).

## LEGAL STANDARD

### I.   Motion for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), "and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "All ambiguities must be resolved in favor of the non-moving party and all permissible inferences from the factual record must be drawn in that party's favor." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

If the moving party can show that "there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the nonmoving party must come

forward with specific facts showing that there is a genuine issue for trial." *Peterson v. Regina*, 935 F. Supp. 2d 628, 634 (S.D.N.Y. 2013) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

To defeat a motion for summary judgment, the non-moving party must identify probative, admissible evidence from which a reasonable factfinder could find in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-257 (1986). It "requires the nonmoving party to go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." 477 U.S. at 261 n.2 (citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. . . . [I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." 477 U.S. at 248. If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from

which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (citations omitted).

## II.   42 U.S.C. § 1983

Section 1983 provides a cause of action against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983; *Whalen v. Cnty. of Fulton*, 126 F.3d 400, 405 (2d. Cir. 1997) ("To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.").

The Second Circuit has held that an individual placed in foster care may pursue a claim under § 1983 for violations of her constitutionally protected rights. *Doe v. New York City Dep't. of Soc. Servs.*, 649 F.2d 134, 141-42 (2d Cir. 1981) ("When individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the nonfeasance of which may

violate the constitution.").  In particular, "children in foster
care [have] a substantive due process right [under the
Fourteenth Amendment] to protection from harm."  *Marisol A. by
Forbes v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996); *see
also Tylena M. v. Heartshare Children's Servs.*, 390 F. Supp. 2d
296, 302 (S.D.N.Y. 2005).  The right of foster children to be
free from harm "includes the right to essentials, such as
adequate food, shelter, clothing, and medical attention."
*Richards v. City of New York*, 433 F. Supp. 2d 404, 422-23
(S.D.N.Y. 2006).

        In cases regarding foster care, liability is often
based on the failure to act.  "Liability for nonfeasance of such
affirmative duties by a governmental custodian requires that (1)
the omissions were a 'substantial factor' leading to the denial
of a constitutionally protected liberty or property interest,
and (2) the officials in charge of the agency being sued must
have displayed a mental state of 'deliberate indifference.'"
*Phillips ex rel. Green v. City of New York*, 453 F. Supp. 2d 690,
722 (S.D.N.Y. 2006) (citing *Doe*, 649 F.2d at 141; *Richards*, 433
F. Supp. 2d at 423-24; *Tylena M.*, 390 F. Supp. 2d at 302).
"[G]ross negligent conduct creates a strong presumption of
deliberate indifference."  *Doe*, 649 F.2d at 143.

        Under *Monell v. Dep't of Social Servs.*, 436 U.S. 658
(978), the City cannot be held liable under § 1983 on a theory

of *respondeat superior*. *See also Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 403 (1997) ("A municipality may not be held liable under § 1983 solely because it employs a tortfeasor."). Rather, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation," *City of Canton v. Harris*, 489 U.S. 378, 385 (1989), which can be demonstrated by showing: "(1) a formal policy, promulgated or adopted by the City; (2) that an official with policymaking authority took action or made a specific decision which caused the alleged violation of constitutional rights; or (3) the existence of an unlawful practice by subordinate officials was so permanent or well settled so as to constitute a 'custom or usage' and that the practice was so widespread as to imply the constructive acquiescence of policymaking officials." *Bradley v. City of New York,* No. 08-cv-1106, 2009 WL 1703237, at *2 (E.D.N.Y. June 18, 2009) (internal citations omitted).

A *Monell* claim may be based on inadequate supervision where the plaintiff establishes: (1) defendants' "duty to act by proving they should have known their inadequate supervision was so likely to result in the alleged deprivations so as to constitute deliberate indifference under *Walker [v. City of New York*, 974 F.2d 293 (2d Cir. 1992)]"; (2) that there were "obvious and severe deficiencies in the . . . defendants' supervision that reflect a purposeful rather than negligent

28

course of action"; and (3) that there was "a causal relationship between the failure to supervise and the alleged deprivations to plaintiff[]." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007).

The Second Circuit "has identified three requirements before a municipality's failure to train or supervise constitutes deliberate indifference." *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007). "First, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation. Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* (internal citations and quotation marks omitted).

Courts have extended *Monell*'s limitations on *respondeat superior* liability to private organizations acting under color of state law. *See, e.g.*, *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990) ("Private employers are not liable under § 1983 for the constitutional torts of their employees, unless the plaintiff proves that 'action pursuant to official . . . policy of some nature caused

a constitutional tort.'") (quoting *Monell*, 436 U.S. at 691) (internal citation omitted) (ellipsis and emphasis in original); *Mejia v. City of New York*, 119 F. Supp. 2d 232, 275 (E.D.N.Y. 2000).

## DISCUSSION

### I.  Heartshare's Status a State Actor

The Heartshare defendants' motion for summary judgment focuses on the argument that Heartshare is entitled to summary judgment on plaintiff's § 1983 claims because it is not a state actor subject to liability under § 1983.[2]  ECF No. 135, Memorandum of Law in Support of Heartshare Defendants' Motion for Partial Summary Judgment ("Heartshare Mem.") at 4-9.

This court previously held that Heartshare acts under color of state law under the public function and joint action or close nexus tests. *See Jewels v. Casner et al.*, Case No. 12-cv-1895, ECF No. 281, Sep. 30, 2017 Memorandum & Order ("*Casner Order*") at 24-28.  The court concluded that the Second Circuit's decision in *Perez v. Sugarman*, 499 F.2d 761 (2d Cir. 1974), which determined that private foster care agencies are state actors for § 1983 claims, remains good law and is binding.

---

[2] The court notes that Heartshare moved for summary judgment on other grounds in its motion, but that those arguments were mooted by the parties' stipulation.  *See* ECF No. 132, Nov. 20, 2008 Stipulation & Order of Partial Dismissal.

The Heartshare defendants identify two decisions issued since the court issued the *Casner* Order, in which district courts rejected *Perez* and determined that private foster care agencies are not state actors, and argue that *Perez* should be reconsidered based on this recent case law. Heartshare Mem. at 7-8.  Although some courts in this Circuit have questioned *Perez*'s continued force "in light of more recent Supreme Court decisions emphasizing the exclusivity element of the public function test . . .[,] they have found that it remains good law unless and until the Second Circuit holds otherwise, and they have found private foster agencies to be state actors."  *Mortimer v. City of New York*, 2018 WL 1605982, at *13 (S.D.N.Y. Mar. 29, 2018).  This court relies on its previous analysis and reaches the same conclusion that *Perez* remains good law and that Heartshare is a state actor subject to liability under § 1983.

The Heartshare defendants' motion for partial summary judgment is denied.

## II.    Section 1983 Claims against Heartshare and City Defendants

### A. Individual Defendants Lewis & Ellis (Heartshare)

Based on the record evidence, the jury must resolve disputes of fact as to whether Lewis and Ellis knew or should have known of the risks of harm that plaintiff would face in the

Hoyte household, both before and after she was placed there, and whether they properly discharged their duties toward her.

Ellis was employed by Heartshare from June 2009 until October 2010. ECF No. 158-14, Cecilia Ellis Deposition Transcript ("Ellis Tr.") 13:24-14:2. She believed that she was responsible for an average of 15 cases and 20 children during her tenure at Heartshare. Ellis Tr. 18:10-17. Lewis provided her a case summary for each of her cases. *Id.* 24:17-25:7. Lewis was responsible for making sure that she followed the City's policies. *Id.* 26:24-27:4.

Ellis believed that Lewis instructed her to input case notes in Connections within two weeks after an occurrence. Ellis Tr. 38:8-18. She was taught by Heartshare and ACS not to cut and paste the same case notes in Connections. *Id.* 41:7-19. Ellis denied that she ever did so or that anyone at Heartshare ever discussed with her whether she had duplicate notes. *Id.* 38:19-39:2. Ellis also believed that she input all of her contacts with plaintiff into Connections, which was her regular practice. *Id.* 42:19-43:2.

Ellis had a meeting with Natalie Barnwell, the Director of Foster Care at Heartshare, in which Barnwell told her that she needed to enter her case notes on time. *Id.* 64:18-65:25. Ellis reiterated that she believed the time frame for entering her notes was less than a week or less than two weeks.

*Id.* 66:2-8.  Between December 15, 2008 and August 5, 2010, Ellis entered her case notes regarding home visits to plaintiff within two weeks only six times (for visits conducted on March 12, 2009; November 23, 2009; January 28, 2010; April 27, 2010; July 13, 2010; and August 5, 2010).  Ex. 25 at ACS-DJ-000373, ACS-DJ-000399-400, ACS-DJ-000407, ACS-DJ-000425-25, ACS-DJ-000446-47, ACS-DJ-000450-51.  Ellis's other home visit case notes were submitted between 16 and 76 days after the visit.  *See generally* Ex. 25.

Ellis suggested to Lewis that her caseload be reduced and felt that having ten cases would have been reasonable, but Lewis told her that a reduction would not be possible because there were not enough case planners.  Ellis Tr. 91:5-24.  Ellis felt she did not receive adequate support from Heartshare to properly perform the tasks required by her job, though she did not believe that her caseload impaired her ability to properly care for the children assigned to her.  *Id.* 98:9-99:3.

Regarding plaintiff's time spent in the Shore home, Ellis testified that plaintiff told her that she had a good relationship with Shore's son—that they were like brother and sister.  Ellis Tr. 114:6-16-25.  Because Shore was considering adopting plaintiff, "there was never any indication that there was an issue or threat between [plaintiff and Kyle Shore.]"  *Id.* 114:13-16.  As to plaintiff's subsequent placement, Ellis

testified that the Hoyte home was clean and tidy, and that she never saw mice, roaches, or mold in the home. *Id.* 145:8-19.

Lewis testified that he was responsible for supervising the Heartshare case planners assigned to plaintiff, which included ensuring that the case planners made visits, entered their case notes into the Connections system within 24 to 72 hours of the event recorded, ensured that the children attended school, and obtained mental health treatment. Pl. 56.1 ¶ 251. Despite this testimony, between December 15, 2008 and August 5, 2010, the shortest amount of time Ellis took to enter case notes for her home visits to plaintiff was 4 days (recording a January 28, 2010 visit on February 1, 2010 and recording an August 5, 2010 visit on August 9, 2010). Ex. 25 at ACS-DJ-000407, ACS-DJ-000450.

Lewis supervised four individuals and monitored their work of monitoring foster children and families. ECF No. 158-23 Lewis August 12, 2015 Deposition Transcript ("Lewis 1 Tr."). 33:11-24. He was responsible for making sure that each case planner followed Heartshare's policies. Lewis 1 Tr. 38:5-9. Lewis also testified that he met with case planners weekly to discuss case dynamics. *Id.* 46:25-47:17. Each case planner had 15-20 cases, and a case could have more than one child included in the case. *Id.* 35:21-36:3. Lewis estimated that he was supervising 60-80 children. *Id.* 36:9-11. Lewis agreed that the

eventual change to reduce the number of cases per caseworker had a positive improvement on child outcomes.  ECF 158-24, Lewis June 21, 2017 Deposition Transcript ("Lewis 2 Tr.") 12:9-16.

Lewis could determine whether a case planner was entering case notes in a timely fashion by checking Connections. Lewis 1 Tr. 45:5-13.  Lewis generally reviewed case notes once a week, which allowed him to see whether they were entered timely. Lewis 1 Tr. 45:14-46:11.  He also reviewed the content and quality of the weekly notes in his review.  *Id.* 48:6-24.  He also checked to determine whether the notes were identical, because duplicating notes was not allowed.  *Id.* 48:25-49:15. But the substantive text of Ellis's case notes for her home visits to Cyris Jewels on July 23, 2009 and August 26, 2009 are identical, except that the July 23, 2009 entry ends with a line stating that the next home visit is scheduled for August 26, 2009.  Ex. 25 at 130-32.  And on November 2, 2009, APA sent a letter to Heartshare recapping a meeting on September 15, 2009 in which the parties discussed duplication of progress notes as an area in need of improvement for the agency.  ECF No. 152-33, Ex. 33 at ACS-DJ-011709-710.  Lewis described Ellis as an average case planner and claimed that she did her job to the best of her abilities, despite some concerns about her "doing progress notes on time . . . and doing home visits, school visits, that sort of thing[.]"  Lewis 2 Tr. 59:11-25.

Lewis testified that he did not review a case file when plaintiff and her siblings were transferred to Heartshare because he was never given a case file for them. Lewis 1 Tr. 89:12-20. Lewis asked his director, Natalie Barnwell for a case file when the case was transferred, but never received one, despite asking three or four times through March 2009. *Id.* 92:17-94:8. Lewis also did not have access to the Connections database for four to six months after plaintiff's case was transferred to Heartshare. *Id.* 36:22-37:19. Heartshare employees could not access the plaintiff's case file in Connections until March 2009. *Id.* 95:13-96:13. When Lewis reviewed the file, it was incomplete and did not cover the full history of plaintiff's time in foster care, and instead the file only contained about six months of information. *Id.* 96:8-97:2.

Lewis testified that he never learned of any findings that the Hoyte home had physical deficiencies such as holes in the wall, mold, dirt, and clutter. Lewis 1 Tr. 106:16-20. It is the obligation of a case planner to be aware of physical defects in a home that bear on the safety and well-being of a foster child, and it is the case planner's obligation to document such defects. *Id.* 121:18-122:4. A case planner should report such defects to her supervisor, and Lewis did not recall any case planners bringing defects in the Hoyte home to his

attention or seeing any in the case notes.  Lewis 1 Tr. 122:5-
18.

Based on the presented evidence, there are disputes of
fact for a jury to resolve regarding whether Lewis and Ellis
knew or should have known of the risks plaintiff faced and
failed to discharge their duties to her.  The parties dispute
whether Ellis was aware of the conditions of the Hoyte home both
before and at the time of plaintiff's transfer there.  Ellis's
case notes reflecting that plaintiff was happy to move to the
Hoyte home conflict with plaintiff's testimony that she informed
Ellis she did not with to stay in the Hoyte home due to the
conditions of the home.  The parties dispute whether Ellis was
aware that plaintiff was not staying in the Hoyte household.
Plaintiff testified that she would not remain in the home due to
its conditions, which she asked Ellis to see.  And although the
case notes reflected "adequate food" in the home when Ellis made
scheduled visits, plaintiff testified that there often was not
and that she informed Ellis of this.

Regarding Lewis's supervision of Ellis, she requested
a reduction in caseload and was denied one.  Whether she could
adequately handle her caseload is an open question, especially
considering that she frequently failed to timely file case
notes.  Even assuming Lewis reviewed Ellis's untimely filed case
notes, the veracity of these notes is in question in part due to

37

plaintiff's testimony that Ellis avoided inspecting the Hoyte home thoroughly and due to the fact that Ellis's notes do not reflect the conditions of the home that were documented by the City's investigator on August 5, 2010, after Ellis had visited the home earlier in the day (and which were noted to have been the same as conditions reported years before). The veracity, or sufficiency, of the case notes is especially called into question due to the fact that Ellis's case notes from August 5, 2010 do not mention the presence of bugs and other conditions throughout the home on the same day that the City's investigator reported them. Although the court notes that some of the offered evidence appears to establish liability of the defendants, such as Ellis's case note reporting that Ellis did not know how plaintiff was obtaining money and that Mrs. Hoyte reported to Ellis that she thought plaintiff was engaging in prostitution, the court recognizes that it would have to weigh evidence to rule in either party's favor at this stage.

The disputes regarding what Ellis and Lewis knew or should have known, as well as what they did with the information they had, are material for determining whether the individual Heartshare defendants were deliberately indifferent to the risks plaintiff faced. Accordingly, plaintiff is denied summary judgment regarding her § 1983 claims against the individual Heartshare defendants.

B. Heartshare's Liability

There are disputed facts as to whether Heartshare had a policy or practice of failing to monitor foster homes in its care and was deliberately indifferent to the needs of children under its supervision.  Even after resolving the disputes as to Ellis and Lewis's conduct, there is a broader question of fact whether what occurred in plaintiff's case is an exception to Heartshare's otherwise appropriate practices or indicative of Heartshare's policy.  Resolution of this issue requires weighing evidence by the jury.

Plaintiff argues that failures by Ellis and Lewis arose from Heartshare's practice of overloading caseworkers with responsibility for more children than professional standards or the City allowed.  Pl. Mem. at 28.  Although Ellis testified that she requested a reduced caseload and did not feel adequately supported, she also testified that she felt her ability to do her job was ultimately not impaired.  There is a dispute regarding whether any of Ellis's failures were due to an excessive caseload, as well as whether caseworkers were consistently overloaded.

It is also not clear whether an excessive caseload is what caused Ellis to file her case notes late.  The submission of timely (and accurate) case notes would have allowed supervisors or other Heartshare managers to determine that cases

were being monitored and to identify any red flags unaddressed by a caseworker. Although Ellis often filed her notes late, she testified that she was told by the Director of Foster Care that she needed to timely update her case notes and Lewis testified that this was an area of concern regarding Ellis's performance. The late entry of case notes by Ellis raises a dispute whether Heartshare allowed caseworkers to ignore their responsibility to timely update case files.

Heartshare accepted the transfer of children from Concord without the complete case files and without access to the Connections case note database system to review the case notes for the children whose safety was entrusted to Heartshare. Pl. 56.1 ¶ 140. Despite lacking access to these records, Heartshare certified Mr. Hoyte as a foster parent six days after the transfer without meeting him or inspecting his home. Heartshare did not conduct a State Central Register database check for reports of abuse by the Hoytes when Heartshare received plaintiff's case in 2008, waiting until late 2009 to do so. Whether such failures to inspect new homes and foster parents was a common practice is not clear from the record.

Although plaintiff has not established at this stage that Heartshare had a policy or practice of deliberate indifference to the children in its care, the court notes that there is evidence from which a jury could conclude so. Prior to

the transfer of plaintiff's case to Heartshare, the City

submitted a letter to Heartshare on September 3, 2008 that

identified an increase in OSI cases as a challenge for

Heartshare to address.  ECF No. 152-7, Ex. 27 at 8011-12.

Whatever actions Heartshare took to address this problem, for

fiscal years 2008, 2010, and 2011, ACS gave Heartshare a

Scorecard rating of zero on a scale of zero to one hundred (with

zero being the worst possible rating) for "frequency of OSI

indicated cases."  Pl. 56.1 ¶ 100.  Heartshare was aware of

those ratings.  *Id.* ¶ 101.  Whether these scores resulted from

ignoring red flags or from incidents that occurred despite

Heartshare's appropriate efforts is a question for the jury to

decide.

     Because a jury could find that Heartshare's policy was

one of deliberate indifference, the court denies plaintiff's

motion for summary judgment as to Heartshare's § 1983 liability.

### C. Individual Defendant Russo (City of New York)

     There is also a dispute as to whether defendant Russo

can individually be held liable for her conduct.

     "Municipal policymakers may be held liable in their

official capacity under § 1983 for a failure to supervise if

they should have known that inadequate . . . supervision was so

likely to result in the violation of constitutional rights, that

[they] . . . can reasonably be said to have been deliberately

indifferent to the need." *Tylena M. v. Heartshare Children's Servs.*, 390 F. Supp. 2d 296, 303 (S.D.N.Y. 2005) (citing *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir. 1992) (internal quotation marks omitted)). "An individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority,' but can be held liable if he was personally involved in the alleged deprivation." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (citation omitted). "The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [individuals] by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Russo was the Deputy Commissioner of the Division of Quality Assurance. ECF No. 158-27, Valerie Russo Deposition Transcript ("Russo Tr.") at 17. As the Deputy Commissioner,

Russo managed and further developed the functions of the ACS training academy, the Office of Agency Program Assistance, the Office of Quality Improvement, and the Office of Research and Development. Defs. 56.1 ¶ 9. She was "responsible for coordinating the Commissioner's Improved Outcomes for Children work." Russo Tr. at 18. According to Russo, she "managed and supervised[,] and also coordinated. [She] really led the Commissioner's effort around Improved Outcomes for Children[,] which was a systemwide reform." Russo Tr. 19:9-20. Russo's duties did not include direct supervision of children in foster care. Defs. 56.1 ¶ 12.

When asked to confirm that Scorecard was an initiative she led, Russo stated she "would say a transition from Equip to Scorecard." Russo Tr. 80:5-9. She reported directly to the Commissioner of ACS. *Id.* 26:4-6. Agency performance was measured by EQUIP before transfer to Scorecard. *Id.* 57:24-58:11. The qualities being measured were basically the same. *Id.* 58:16-24. She led the transition from EQUIP to Scorecard. *Id.* 65:11-14. She "wasn't technically creating actual measurements, but [she] was involved in figuring out which ones fit in safety, which ones fit in permanency . . . and being clear that those were the kinds of things that were being measured." *Id.* 80:17-23. But she said she and the Commissioner

approved the technical parameters of how things were being measured. *Id.* 80:24-81:6.

"[A]s Deputy Commissioner, [Russo] was involved in the decision to end [Concord Family Services'] contract[.]" Russo Tr. 100:9-18. Regarding the transfer of Concord cases to other agencies, Russo made recommendations to the Commissioner of ACS based upon the work performed by staff in multiple ACS divisions. Defs. 56.1 ¶ 13. Russo stated that geography was a factor in the transfer decisions, as well as "overall performance of the organization." Russo Tr. 106:19-24; *see also* ECF No. 158-5, Frank Callagy Apr. 26, 2016 Deposition Transcript ("Callagy 1 Tr.") 60:7-18 (In transferring a case to a new agency, geography and performance were considered, which included checking that the agency was not on some type of status that would prevent it from being able to receive any cases.); ECF No. 158-10, Erin Clark Deposition Transcript ("Clark Tr.") 34:7-20 (When agencies closed and children were moved to other agencies, different factors including geography and performance would be considered.).

"[Russo] wouldn't have been involved in a case specific [sic]." Russo Tr. 107:98-10. She "wouldn't have known about the special circumstances on a case by case basis" as to assigning a child. *Id.* 108:7-9. Russo stated that she would not have been involved in the transfer of case files; rather,

her purview was broadly determining the distribution of cases. *Id.* 115:7-24.

The parties have not provided sufficient evidence for the court to determine as a matter of law whether Russo is a policymaker. Although a title alone cannot establish policymaking status, it is not clear whether her role in fact involved making policy. She described herself as managing, coordinating, and supervising Improved Outcomes for Children and stated that she led the efforts around this reform for measuring agency performance. This is in tension with her testimony that she did not create measurements for the new Scorecard agency grading, but simply organized the measures (although presumably this organization was designed to improve the City's ability to monitor agencies). Russo further stated that she approved the technical measurements with the Commissioner, but it is not clear whether her suggestions were rubberstamped by the Commissioner, considered as part of a collaborative discussion, or accepted or rejected entirely without her input.

In addition to the City's method of monitoring and rating agencies, there are disputed issues of fact as to Russo's involvement in plaintiff's transfer to Heartshare. Russo testified that she was not involved in individual cases, but that she made recommendations regarding the transfer of cases from Concord, based on work that considered overall performance

of the receiving agencies.  There is a dispute as to whether safety and risk to plaintiff and the other children transferred from Concord to Heartshare were actually considered in this process.  There is testimony that overall performance was a factor, the barest evidence offered by the defendants that safety was a consideration in transferring Concord cases.

Plaintiffs, by contrast, offer evidence that the City defendants were aware of problems with Heartshare at the time of the transfer from Concord to Heartshare.  As noted above, the City had sent a letter to Heartshare a few months before the transfer noting that Heartshare had had an increase in OSI cases.  Plaintiffs also highlight that a Corrective Action Plan (CAP) had been issued to the Hoyte household and could not have run its course at the time of transfer.  ACS had issued a CAP on October 3, 2008, which stated, among other things, that Concord "should closely monitor the home[,] . . . includ[ing] making unannounced visit [SIC] to the home from one of their announced visit [SIC] for a period of six months."  Ex. 4 at ACS011371.  The six-month period could not have ended by the time of transfer.

Defendants cite December 29, 2008 case notes in Connections that reflect Concord's response to the CAP, *see* Defs. Response to Pl. 56.1 ¶ 240, but these notes do not provide proof that Concord engaged in close monitoring or that any

unannounced visits occurred.  The notes actually state that the foster parents "ha[d] not made themselves available to the [case planner] nor the agency" and suggests that there was still concern regarding whether the Hoytes were failing to provide clothing, food, or allowance to foster children.  Ex. 4 at ACS011373.  Lewis testified that he would have wanted to know if a home assigned to him had a CAP in place and that he did not know there was a CAP in place for the Hoyte home at the time of transfer.  Pl. 56.1 ¶¶ 241, 243.  Although defendants assert that the CAP and Concord's response to the CAP were in Connections, Lewis did not have access to the Connections database at the time of the transfer or for several months after.

There are disputed issues regarding Russo's role in plaintiff's transfer to Heartshare and her involvement in creation of the agency monitoring system in existence while plaintiff was at Heartshare.  Therefore, plaintiff's summary judgment motion and the City defendants' summary judgment motion regarding Russo's individual liability are denied.

### 1. Qualified Immunity

"[Q]ualified immunity shields government employees acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their conduct violated clearly established rights of which an objectively reasonable official

would have known." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 568-69 (2d Cir. 1996). "The 'dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Hernandez v. Mesa*, 137 S.Ct. 2003, 2008 (2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Courts should determine whether qualified immunity applies "long before trial" and "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 228 (1991) (per curiam).

The court cannot determine that Russo is entitled to qualified immunity at this stage because of the disputes regarding her role in plaintiff's assignment to Heartshare. If it is true that agency performance was considered in the Concord transfer and that Russo recommended plaintiff's assignment after a process in which safety was considered, Russo may be entitled to qualified immunity even if the transfer was negligent. But if Russo made the recommendations without consideration of safety, it cannot be said that her actions were objectively reasonable in carrying out her duty to protect foster children from harm. A determination that Russo is entitled to qualified immunity as a matter of law is inappropriate when there are questions as to whether Russo was aware or should have been

aware of a risk to plaintiff and acted without regard to that
risk.

           D. City's Liability

        Although the court recognizes that the parties have
stipulated that the defendants cannot be held liable solely for
acts occurring prior to December 15, 2008, the court also
recognizes that the City had knowledge of or access to
information concerning events that occurred before that date and
which could have informed its actions.  Some of these events are
described below.

        On September 20, 2006, a Concord caseworker went to
the Hoyte household for a scheduled visit and reported that
neither of the Hoytes was home.  ECF No. 152-37, Ex. 37 at ACS-
0016736.  The home "was in total disarray."  *Id.*  The living
room had garbage on the floor, the "kitchen sink had dishes
piled on the top[,] and garbage was all over the floor."  *Id.*
The children were also home alone unsupervised for over three
hours.  *Id.* at ACS-0016739.

        On June 27, 2008, a caseworker visited the home and
recorded that the cabinets and refrigerator had food, but not
enough for the number of individuals who resided in the home.
*Id.* at ACS-0016885.  On September 16, 2008, a case planner told
the Hoytes that she was looking into removing a foster child
from the home in part due to the foster parent's "lack of

provision for the child" regarding clothing and allowance.  *Id.*
at ACS-00016864.  Two other children reported that they had not
received allowance or sneakers for school, and the case planner
informed the Hoytes that they "ha[d] not been meeting the
children's needs[.]"  *Id.*  On October 3, 2008, ACS created a CAP
that directed the agency to closely monitor the Hoyte household
and to make unannounced visits for a period of 6 months.  ECF
No. 152-4, Ex. 4 at 3101.

On October 23, 2008, one of the children in the Hoyte
home stated that he sometimes stole because the foster parents
did not buy him clothing or food and did not give him an
allowance.  *Id.* at 16934.  The Concord case planner observed
that the clothing the child wore was bought by his mother and
noted that she occasionally bought food or gave carfare to the
child because the child had no money with which to eat or buy
food.  *Id.* at 16934-35.

On November 24, 2008, a Concord home assessment
revealed that the wall by the entrance door of the home had a
hole that was covered with plaster and that there were three
holes in the dining area.  ECF No. 152-14, Ex. 14 at 3005.  A
wall close to the refrigerator in the kitchen had a hole, and a
glass patio door in the living room was broken.  *Id.*  One of the
bedrooms had four holes in the walls, including one on the door
which was falling apart.  *Id.*  Cyris's room had three holes in

the wall.  *Id.*  Some of the holes in the home were covered with plaster, but the damage and the condition of the home were obvious.  *Id.*

Meanwhile, on September 3, 2008, Heartshare's APA Monitor and Consultant sent Heartshare a letter recapping a meeting on August 7, 2008.  ECF No. 152-7, Ex. 27 at 8011. Although the letter lists the agency's areas of strength, included among the "challenges Heartshare should aggressively address in the coming year" was an "increase in OSI cases."  *Id.* at 8011-12.  The letter indicates that Heartshare had identified the challenge of a "6% increase in OSI reports in the last year" and notes that one of the consequences was that they were "required to close more homes as a result of indicated OSI cases."  *Id.* at 8014.  It is unclear whether the City or the agency required that the homes be closed.

Plaintiff's expert, Dr. Michael Sobel, authored two reports under penalty of perjury in which he analyzed the rate of abuse of New York City foster children and children in Heartshare's care using data produced in discovery and published by the City in its Child Welfare Indicators Annual Reports for the years 2007-2010.  ECF No. 152-10, Ex. 10, Dec. 5, 2017 Sobel Report; ECF No. 152-11, Ex. 11, Sep. 26, 2018 Sobel Report.  Dr. Sobel's second report reanalyzed the data to address the fact that people sometimes remain in foster care after turning

eighteen, though Dr. Sobel's ultimate conclusions were not altered.  Ex. 11 at 1.  According to Dr. Sobel's analysis of the data collected by the City, the rate of abuse and/or neglect by New York City foster children by foster parents was higher than the rate of abuse and/or neglect of New York children in the general population.  Pl. 56.1 ¶¶ 16; 82.

From 2007 through 2010, the number of indicated abuse/neglect events involving children under the age of 18 under Heartshare's supervision increased.  ECF No. 152-5, Ex. 5. The rate of abuse and neglect of Heartshare foster children was higher than average among foster care agencies.  Pl. 56.1 ¶ 21. In 2007, there were 27 State Central Register ("SCR") reports of abuse, neglect, or maltreatment and 5 indicated cases for Heartshare foster children out of a total of 423 children.  ECF No. 152-6, Ex. 6, Amended Responses to Plaintiff's Third Set of Interrogatories, Exhibits A-C at ACS-DJ-014251-53.  In 2008, there were 53 SCR reports and 14 indicated cases for Heartshare foster children out of a total of 437 children.  *Id.*  In 2009, there were 64 SCR reports and 17 indicated cases for Heartshare foster children out of a total of 448 children.  *Id.*  In 2010, there were 49 SCR reports and 16 indicated cases for Heartshare foster children out of a total of 387 children.  *Id.*

Dr. Sobel concluded that Heartshare's rate of abuse and neglect of its foster children was three times that of the

rate in the general population and worse than 90% of the other foster care agencies in New York City.  Pl. 56.1 ¶¶ 22; 81.  For fiscal years 2008, 2010, and 2011, ACS gave Heartshare a Scorecard rating of zero on a scale of zero to one hundred (with zero being the worst possible rating) for "frequency of OSI indicated cases."  Pl. 56.1 ¶ 100.  The 2008 preliminary Heartshare Scorecard was distributed in November 2008, prior to the City's decision to transfer plaintiff to Heartshare.  Pl. Supp. ¶ 204.

        The defendants assert that prior to 2013, ACS's regular custom was to adhere to the guidelines promulgated by OCFS with respect to the maximum number of foster children who could be assigned to each contract agency caseworker.  Defs. 56.1 ¶ 96; *see also* ECF No. 165-6, Ex. G at ACS 01692 ("The Contractor shall make every effort to maintain sufficient qualified staff . . . in accordance with the Regulations of OCFS."); ECF No. 165-7, Ex. H at ACS-DJ-011886 ("Proposers should develop staffing ratios that are appropriate for their program models and aligned with requirements of the NYS OCFS Standards of Payment for the specific rate model being proposed for their program.").  Beginning in 2006, the OCFS Standards of Payment manual provided for staffing ratios of 12 children to each caseworker.  ECF No. 152-28, Ex. 28 at ACS-0015601.  The 12:1 ratio was consistent with the Child Welfare League of

America Standard No. 3.48, of 12 to 15 children per caseworker, which defendant Lewis believed was the standard to which all agencies were required to adhere.  Pl. 56.1 ¶¶ 120-21.

The defendants do not dispute that Ellis had approximately 15 cases and 20 children under her supervision, and that Lewis supervised four caseworkers and between 60-80 children.  Defendants also stated that ACS monitored the contract agency caseloads.  Defs. 56.1 ¶ 99.  If ACS had a concern that an agency did not have enough case planners to adequately cover their cases, ACS could contact the agency and could close intake if the agency did not immediately address the concern.  *Id.* ¶¶ 101-03.

### 1. Certification of Indicated Cases

When a case of abuse, neglect, or endangerment of a foster child is confirmed, a foster care agency is required to submit to the City a written discussion of the case and an explanation of the actions that the agency took in response to the incident of confirmed abuse.  Pl. 56.1 ¶ 104.  For every explanation, the City must decide whether the agency's response to the confirmed report was prudent.  *Id.*

Frank Callagy, who worked in APA within ACS, testified that he had experience reviewing foster care agency certification of substantiated cases, which he did from approximately 2010 through 2013.  ECF No. 158-6, Frank Callagy

54

Dec. 12, 2017 Deposition Transcript ("Callagy 2 Tr.") 30:15-19; 30:24-31:15. Callagy would review a sheet that had the number of indicated cases for a particular time period and the agency's response of what it did related to those cases. Callagy 2 Tr. 30:24-31:9. He would review the responses and recommend to his boss whether the actions taken by the agency were prudent. *Id.* 31:9-11. Agencies were required to make these certifications once a year. *Id.* 31:21-32:2.

To determine whether the agency actions were prudent, Callagy and his peers, did not use written criteria, but relied on their experience in foster care and determined whether the agencies were responsive to any safety issues. Callagy 2 Tr. 34:9-19. If an agency response was deemed not prudent, the certification would be sent back to the agency with questions. *Id.* 37:20-38:3. There would be a reassessment after the agency responded to determine if the follow up actions taken by the agency were prudent. *Id.* 39:4-16.

Michael Walker, who worked in the office of procurement at ACS and processed foster care agency contracts, did not recall that the APA ever found an agency's action in response to an indicated report not to be prudent. ECF No. 158-29, Michael Walker Deposition Transcript ("Walker Tr.") 19:20-24. Camelia Anders, an assistant commissioner in ACS, testified in her deposition that sometimes additional information was

needed from an agency to determine whether an agency's response was prudent, but she did not ever find that an agency's response was not prudent after receiving such information. ECF No. 158-1, Camelia Anders Deposition Transcript ("Anders Tr.") 31:16-23. Callagy testified that that during the time that he was evaluating certifications, he found agency responses not to be prudent fewer than ten times. Callagy 2 Tr. 37:11-19.

Callagy did not suggest actions the agency should take to prevent further incidents of abuse or neglect. Callagy 2 Tr. 39:20-40:2. An agency's APA monitor or supervisor would be the person responsible for suggesting such actions, though the suggested action would be based on overall performance, not based on the certification process. *Id.* 40:3-14. Callagy never took a course or training on what constituted a prudent response to an indicated case of child abuse and his supervisors never provided him with any training on the issue. *Id.* 54:4-13. APA's monitoring included looking at all of the Scorecard measures, and the ones related to foster homes and safety in general would lead to conversations with agencies about their performance. *Id.* 55:11-23. Callagy did not consider the number of indicated cases as a factor in evaluating certifications. *Id.* 59:23-60:4. Callagy testified, however, that the APA monitors would consider the indicated cases as part of overall performance of an agency. *Id.* 60:5-23.

## 2. Scorecard & APA review

A Scorecard is the mechanism the City uses to assess agencies uniformly. ECF No. 158-10, Erin Clark Deposition Transcript ("Clark Tr.") 6:24-7:3. Scorecards, which came into use in 2007, rely on case record review portions called Provider Agency Measurement System (PAMS). Clark Tr. 7:3-8, 22-25. They are used to evaluate quality and compliance measures using a uniform system. *Id.* 8:2-8. All foster care agencies are evaluated using the Scorecard annually. *Id.* 7:9-21. The cards created a system that both the agencies and ACS could understand and were designed so people could be held accountable. *Id.* 8:9-17.

PAMS reviews cases and sends the data to the agency and APA. Clark Tr. 64:16-21. PAMS is a uniform case record review tool that looks at areas of safety, permanency, and well-being in the case records for a six-month case period. *Id.* 64:22-65:4. This is done by reviewing a sample of cases from an agency in the time period based on documented work by agency staff in the Connections database. *Id.* 65:5-22. A PAMS reviewer could issue an alert if he or she saw an issue in a specific child's file. *Id.* 96:19-97:12. These reports would be sent to a supervisor, an agency's point person for PAMS, and the APA monitor, with a request for follow up from the agency within

48 hours.  *Id.* 97:13-98:8.  APA could issue alerts in its
reviews as well.  *Id.*

Action toward an agency would not be taken based on
one score, but would be based on the whole scope of the work and
the issues the score represented.  Clark Tr. 12:7-20.  When an
agency did poorly, an APA monitor would work with the agency to
improve the practice at issue.  *Id.*  ACS could close intake for
an agency without an agency asking for it.  Clark Tr. 49:9-13.
The City did not have a checklist for what would require
heightened monitoring because agencies were evaluated in the
overall context.  *Id.* 68:15-69:10.

The director of APA compared the performance of the
various agencies on their Scorecards.  Clark Tr. 32:15-20.  But
agencies doing better would not necessarily be given more
children in the following contract.  *Id.* 33:23-34-2.  The APA
could place an agency on heightened monitoring status and would
give the agency written notice of that status.  *Id.* 51:11-19.
An agency would be given written notice if it were being taken
off of, or continuing on, heightened monitoring status.  *Id.*
54:4-20.

One of the ratings on the Scorecard was for "Frequency
of OSI indicated cases."  When asked whether a score of zero for
"Frequency of OSI indicated cases" was considered a bad rating
on a Scorecard, Clark stated that as an APA monitor she would

not consider the score as a zero percent, because it was "in the context of the entire work that is done with the agency in all of the measures[, and one would] never lift one measure out by itself." Clark Tr. 14:17-15:11. She testified that she would look at the information for the Scorecard categories together in context. *Id.* 16:2-25. If looking at the Frequency of OSI indicated cases score, she would also consider scores for items such as Foster Parent Support. *Id.* 17:2-7. Clark confirmed, however, that a score of zero did not represent zero cases of child abuse, that the scores ran from zero to one hundred, and that zero was the lowest possible score an agency could get in a particular category. *Id.* 15:12-22.

No particular score on the "Frequency of OSI indicated cases" factor alone would trigger heightened monitoring. *Id.* 75:2-13. Clark reiterated that the frequency of indicated cases score would not be isolated as the sole basis for action. *Id.* 83:25-84:24. A score of zero would lead to a follow-up conversation about the data. *Id.* 86:8-17. "You would look at the children behind the data, the types of OSIs that were substantiated, . . . the size of the agency, you would take that whole picture and you would look at how they did in some of the other measures, you would definitely look at it, but you wouldn't jump right to heightened monitoring." *Id.* 86:16-24. To Clark's knowledge, the score of Frequency of OSI indicated

reports would never by itself result in heightened monitoring. *Id.* 88:8-13.

One bad Scorecard could lead to termination of a contract, though not usually, and Clark did not know whether an agency was ever terminated because of a bad Scorecard. Clark Tr. 9:13-25. An agency could be terminated for a series of bad scores when there was no improvement or the scores became worse over time. *Id.* 10:2-8. The City could not reduce the number of children sent to a foster care agency based on one Scorecard, but a reduction could be based on a series of bad Scorecards. *Id.* 11:16-25. Clark, however, did not know whether the City had ever reduced the number of children based on a series of bad Scorecards. *Id.* 12:2-6.

According to Clark, agencies existed on a continuum which included regular monitoring, heightened monitoring, corrective actions status, and probationary corrective action status. Clark Tr. 99:4-100:4. If there were continued noncompliance by an agency or a failure after an agency was placed on probationary corrective action status, ACS could terminate the contract. *Id.* 100:5-10. It was possible for an agency to skip a level of monitoring status. *Id.* 101:12-19.

### 3. Contract Renewal

The City's decision regarding the prudence of the agency's response impacts whether the City will renew its

contract with the foster care agency. Pl. 56.1 ¶ 105. Michael
Walker testified in his deposition that the City's contract
renewal process included annual performance evaluations. Walker
Tr. 7:17-9:2; 12:24-13:7. This process requires submission of
certifications of substantiated cases of abuse and neglect by
contract agencies for each contract. Defs. 56.1 ¶ 42.

The finding that the action a foster care agency took
was not prudent, in response to an indicated report, would not
alone preclude an agency from having its contract renewed.
Walker Tr. 19:25-20:6. If APA determined that a foster care
agency's response to an indicated report was not prudent, the
agency would be found not responsible, or placed on a corrective
action plan, after which the agency might be found responsible
if it followed the plan. *Id.* 20:7-17.

Procurement did not always see an agency's Scorecard,
but the Scorecards were sometimes used to show improvement on a
CAP. Walker Tr. 23:8-16. Procurement did not consider the
comparative performance of agencies or the caseloads of agency
caseworkers in renewing the contracts. *Id.* 35:25-36:11. APA,
rather than Procurement, was responsible for determining whether
the information about incidents was accurate. *Id.* 40:15-23. An
agency's low score on its Scorecard for one year would not be a
basis for modifying its contract. *Id.* 40:24-41:4.

After twice exercising options to renew Heartshare's contract with the City for additional three-year terms through February 28, 2009, the parties extended the Heartshare contract for the following time periods: March 1, 2009 through February 28, 2010; March 1, 2010 through June 30, 2010; July 1, 2010 through September 30, 2010; and October 1, 2010 through June 30, 2011. ECF No. 152-41, Ex. 41 at ACS 001870. The Mayor's Office of Contract Services Contract Performance Evaluation concerning the period between March 1, 2010 and February 28, 2011 states in the Comments on Performance Quality that "[Heartshare] received a D in Safety and F in Foster Parent Support Areas. [Heartshare] is engaged in performance improvement with ACS. [Heartshare] is not on Corrective Action Status." ECF No. 141-1, Ex. I at ACS-DJ-015892-894. Heartshare had a Poor subcategory rating for Performance Quality for the time period March 1, 2010 through February 28, 2011. *Id.* at ACS-DJ-015894.

As described above, the City had a number of policies regarding how contract agencies should be monitored over time. What remains in dispute is whether the City actually monitored the agencies and took enforcement actions to hold the agencies accountable. It is not clear whether the number of indicated cases an agency had actually mattered for the City's continued relationship with an agency. The City transferred additional cases to Heartshare after the City had acknowledged that

Heartshare needed to reduce the number of indicated cases occurring with children in its care. And despite Heartshare's continued, repeated low scores on the metric of frequency of indicated cases, Heartshare was never put on any heightened monitoring status and the City continued to renew its contract with Heartshare.

Even if the court accepted the defendants' assertion that focus on indicated cases in isolation is inappropriate for evaluating an agency, there is a dispute of material fact regarding whether the City actually verified agency certifications of indicated cases. Heartshare's certification for the period of "January to December 2010" does not reflect plaintiff's case. Ex. 1 at ACS-DJ-015873-889. Although this court knows that plaintiff was moved to an appropriate home, the fact that her case is missing from the data calls into question whether the City actually knew that indicated abuse cases had been appropriately handled by an agency. Defendants do not identify a Heartshare certification that includes plaintiff's case. Moreover, the data defendants produced reporting annual indicated cases by agency reflects that there were 16 indicated cases by Heartshare in 2010, the *same* number of indicated cases reported in the Heartshare certification that omitted plaintiff's case. *See* Ex. 6 at ACS-DJ-014253.

A jury could credibly find that the City's policy was one of indifference, as evidenced by the City's failure of taking concrete action like requiring enhanced monitoring, removing children, or closing intake.  Whether a failure to appropriately monitor Heartshare reflected the City's policy broadly or an exception to the usual rule is not clear. Plaintiff's expert Dr. Sobel concluded that the rate of abuse and/or neglect involving New York City foster children by foster parents was higher than the rate of abuse and/or neglect of New York children in the general population.  Although not decisive for this motion, Dr. Sobel's conclusion could support a jury's finding that poor supervision of Heartshare reflected a policy of indifference to abuse throughout the foster care system, masked by the City's focus on overall context for agency performance.

The court denies summary judgment on plaintiff's motion and the City defendants' motion as to the City's liability.

## III.   Breach of Contract Claim against Heartshare

Plaintiff argues that Heartshare breached its contract with the City and that Heartshare is liable to the plaintiff as a third-party beneficiary who was injured by the breach.  Pl. Mem. at 29.  Heartshare argues that there was no breach and that

there is an issue of fact regarding whether plaintiff is a third-party beneficiary.  Heartshare Opp. at 9-12.

The court agrees that plaintiff was a third-party beneficiary of the contract between the City and Heartshare. *See Richards v. City of New York*, 433 F. Supp. 2d 404, 430 (E.D.N.Y. 2006) ("There can be no dispute that [foster children] are the third-party beneficiaries of the contract between ACS and [the foster care agency]; they are the people for whom the delegated services are to be provided."); *see also* ECF No. 152-40, Ex. 40 at ACS 001695 ("ACS and the Contractor agree that the fundamental purpose of this Agreement is to provide the best available services, care and treatment to those Public Charges [foster children] who are entrusted to the Contractor's care and further to ensure that the health, welfare and fundamental rights of the children in its care shall be the guiding principle for all decisions which affect their lives."). Because, however, there are disputed facts regarding Heartshare's actions with regard to its services under the contract, as discussed above, the court denies plaintiff summary judgment on the breach of contract claim.

## IV.   Negligence Claims against Heartshare and City Defendants

### A. Exercise of Supplemental Jurisdiction

The City defendants argue that the court should decline to exercise supplemental jurisdiction over plaintiff's

state law claims because dismissal of those claims would be appropriate upon dismissal of the federal claims. For the reasons stated above, the court has not granted the defendants' motions for summary judgment on the federal claims, and plaintiff's federal claims remain for resolution at trial. Moreover, this case has been consolidated with *Jewels v. Casner et al.*, Case No. 12-cv-1895, for trial, and there are federal claims remaining in that case. The court, therefore, will continue to exercise supplemental jurisdiction over the state law claims.

The court denies the City defendants' motion on this ground.

### B. Negligence Claims

Generally, to prevail on a negligence claim under New York law, a plaintiff must establish "that the defendant: (1) owed a duty of care; (2) breached that duty; and (3) that the breach was the proximate cause of the plaintiff's injuries." *Vega v. Fox*, 457 F. Supp. 2d 172, 183 (S.D.N.Y. 2006); *see Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000).

### 1. Negligence Claim Against Heartshare

A foster care agency defendant can establish that it is entitled to summary judgment for negligence by showing that it "did not have sufficiently specific knowledge or notice of

the alleged dangerous conduct which caused the . . . injuries."
*Keizer v. SCO Family of Servs.*, 120 A.D.3d 475, 476-77, 991
N.Y.S.2d 103 (N.Y. App. Div. 2014) ("In other words, the
[defendant] had to show that the third-party acts could not have
been reasonably anticipated."). Moreover, although New York
courts have held that actual or constructive notice to an
institution of prior similar conduct is "generally" required,
*see Mirand v. City of New York*, 614 N.Y.S.2d 372, 637 N.E.2d
263, 266 (N.Y. 1994), even absent actual or constructive notice,
in other circumstances the danger and risk of harm could have
been reasonably foreseen and prevented by the institution. *See*
*Garcia v. City of New York*, 222 A.D.2d 192, 646 N.Y.S.2d 508,
510-11 (N.Y. App. Div. 1996) (holding that a school could be
liable for an assault by an older student on a five-year-old
kindergarten student who was sent into a public bathroom
unescorted, despite no notice of prior acts by the older
student, because it was reasonably foreseeable that sending a
five-year-old into a public bathroom unaccompanied could create
a risk of assault); *see also Murray v. Research Found.*, 184
Misc.2d 453, 707 N.Y.S.2d 816, 821 (N.Y. Sup. Ct. 2000) ("Where
the actions to be taken by the school are so obvious and could
easily have prevented the harm notice is not necessarily an
issue.").

There are disputed facts as to whether Heartshare was aware of the conditions of the Hoyte home, both before and while plaintiff lived there. Heartshare case notes reflected at various times that there was not sufficient food in the home and that the physical conditions of the home were subpar. Moreover, case notes failed to reflect physical conditions of the Hoyte home that were present in both early case notes and at the time of plaintiff's removal from the Hoyte home. Notably, the conditions missing from Ellis's case notes from her visit on August 5, 2010 include the presence of bugs and filth that were reported by the City's investigator when the investigator visited the Hoyte home later on the same day. The parties disagree whether plaintiff told Ellis that she wanted to live in the Hoyte home and whether Ellis was aware that plaintiff was not staying in the home after she was placed there.

Based on the disputed material facts, the court denies plaintiff's motion for summary judgment on the negligence claims against the Heartshare defendants.

### 2. Negligence Claims against City

Plaintiff argues that the City defendants were negligent by breaching their duty to adequately supervise plaintiff, which resulted in her injury. Pl. Mem. at 6-7. Plaintiff argues that the City defendants were on notice that Heartshare had poor performance issues and that there were

problems with the Hoyte home, and thus should not have transferred plaintiff to Heartshare, which placed her in the Hoyte home that was subsequently closed by the City.  Pl. Mem. at 9-12, 14-15.

The City defendants argue that plaintiff's injuries were not reasonably foreseeable.  City Opp. at 2-3.  They argue that the sexual harassment plaintiff faced in the Hoyte home was not known and that plaintiff did not report it.  *Id.* at 2. Defendants argue that the case notes at various times noted no physical problems with the home or indicated the home was safe, and reflected that early complaints about the lack of food were remedied.  *Id.* at 3.  Defendants argue that prior unfounded OSI and Domestic Incident reports did not make plaintiff's injury more foreseeable and that the case records as a whole could not have put the City defendants on notice of conduct similar to the wrongful conduct that caused plaintiff's injuries.  *Id.* at 3-5. The City defendants further argue that they did not fail to exercise due care and that plaintiff fails to identify conduct that was the proximate cause of the injuries plaintiff suffered. *Id.* at 5-6.

The City defendants argue, however, that if the court finds that they breached a duty to plaintiff and the breach proximately caused plaintiff's injuries, plaintiff's claim would be barred by governmental immunity.  City Opp. at 6.  Having

already discussed the disputes of fact regarding whether defendants adequately monitored agencies and were aware, or should have been aware, of the risks plaintiff faced, the court focuses on the governmental immunity question regarding plaintiff's negligence claim against the City.

The City defendants argue that they did not have a special relationship with plaintiff and that the actions they took were discretionary, which would entitle them to governmental immunity for any negligence. City Opp. at 5-9; City Mem. at 25-26. The City defendants assert that *McLean v. City of New York*, 12 N.Y.3d 194 (2009) clarified how governmental immunity attaches to discretionary acts and prevents defendants from being held liable under a theory of negligent supervision of children in foster care. City Mem. at 23-24. *McClean* explained that "[g]overnment action, if discretionary, may not be a basis for liability, while ministerial actions may be, but only if they violate a special duty owed to the plaintiff, apart from any duty to the public in general." *McLean v. City of New York*, 12 N.Y.3d 194, 203 (2009). "[D]iscretionary . . . acts involve the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result." *Tango v. Tulevech*, 61 N.Y.2d 34, 41 (1983).

Plaintiff argues that discretionary decisions that are implemented negligently can subject a municipality to liability and that the City was grossly negligent in its transfer of plaintiff from Concord to Heartshare. Pl. Reply to City Opp. at 3. Plaintiff also questions whether the decision to close Concord was discretionary. *Id.* Plaintiff asserts that the City's disregard for the Heartshare abuse data, placement of plaintiff with Heartshare, ignoring the conditions of the Hoyte home, and allowing plaintiff to be placed in the Hoyte home reflect that there was not an exercise of reasoned judgment consistent with discretionary acts. Pl. Opp. to City Mem. at 21. Plaintiff argues that the act of making a decision alone cannot be the basis for immunity and that decisions must be made in accordance with accepted professional standards. *Id.* at 21-23.

This court previously held that the City and its agents have a special duty to protect foster children and that there is a special relationship between the City and its agents and foster children. *See Casner* Order at 65-69. "[T]he special duty rule assists a plaintiff in establishing a duty of care and . . . operates independently of the governmental function immunity defense, which precludes liability even when all elements of a negligence claim—including duty—have been proved." *Valdez*, 18 N.Y.3d at 77. To prevail on a governmental immunity

defense, a "municipality must do much more than merely allege that its employee was engaged in activities involving the exercise of discretion."  *Id.* at 79.

The court agrees with defendants that the decisions the City defendants made regarding plaintiff involved the exercise of discretion.  Although plaintiff identifies professional standards, such as those of the CWLA, that provide guidelines regarding best practices for foster care oversight, it is not clear that there were any standards which commanded a specific result.  While this court has expressed concern regarding the actions taken by those responsible for plaintiff, it is not clear that there were standards requiring a "compulsory result."  To be clear, plaintiff may still argue that actions taken by defendants were so ineffective or negligible as to amount to deliberate indifference under Section 1983, but that is a different question than whether defendants were authorized to determine which action was most appropriate as a discretionary matter.  The decision to place plaintiff with or allow plaintiff to remain with a particular agency in a particular household involves the exercise of discretion.

"[G]overnmental immunity does not attach to every action of an official having discretionary duties but only to those involving an exercise of that discretion."  *Mon v. City of New York*, 78 N.Y.2d 309, 313 (1991).  "That the departmental

responsibilities of the [City defendants] . . . were sufficiently discretionary to receive immunity does not end the inquiry, however." *Id.* at 314. "Immunity could not apply unless the negligent [action] resulted from the exercise of their discretion." *Id.*

In *Mon*, the New York Court of Appeals considered the question of governmental immunity for two police officers, Kelly and Springer, who were responsible for "investigating and evaluating the background and qualifications of police officer candidates and making the recommendations and final decisions for such appointments[.]" *Id.* The officers were responsible for the hiring of a third officer, Shankman, who had committed an unjustified shooting. *Id.* at 311-12.

Shankman applied for a position with the N.Y.P.D., but omitted a prior arrest in which Shankman's companion fired a gun in the drugstore where Shankman worked and for which Shankman pleaded guilty to disorderly conduct. *Id.* at 312. Kelly investigated Shankman's family, education, military and educational background, and found nothing unfavorable. *Id.* Despite Shankman's earlier arrest, and over the arresting officer's strenuous objection to Shankman's application, Kelly recommended Shankman's approval based on his review of Shankman's entire applicant file and forwarded his recommendation and the applicant file to Springer. *Id.* After

reviewing the applicant file, Springer approved Shankman's appointment. *Id.*

In concluding that Shankman's negligent hiring resulted from an exercise of discretion, the court noted that Kelly was required to make a judgment in evaluating the biographical and background information derived from the Shankman's application and interview. *Id.* at 314-15. When he learned of the prior arrest and conviction, Kelly was "faced with making discretionary decisions concerning the seriousness of the incident leading to the disorderly conduct conviction and how much, if any, additional investigation was warranted." *Id.* at 315. "Whether to make a favorable recommendation in spite of the [prior] incident and Shankman's failure to disclose it necessarily required Officer Kelly to exercise discretion in weighing these factors against Shankman's otherwise favorable record." *Id.* And "Springer's decision to accept Officer Kelly's recommendation and to overlook the disorderly conduct conviction--while unwise, as it turned out--was nevertheless based on the exercise of judgment." *Id.* The court found that the City and the two officers were entitled to governmental immunity. *Id.* at 316.

The Court of Appeals had previously found there was no governmental immunity in a case which involved a civil suit brought against the New York City Parks Department for the

negligent retention of an ex-convict who raped the plaintiff as a child. *Haddock v. City of New York*, 75 N.Y.2d 478, 480 (1990). The ex-convict was hired through a program passed as part of a welfare reform package which allowed benefits recipients, including ex-convicts, to work in public and private nonprofit agencies. *Id.* at 481. During his intake interview and on his fingerprint submission, the ex-convict represented that he had not been convicted of any crime, including moving violations, and he was subsequently hired as a Parks Department worker, a position the City considered not to involve public contact or working with children. *Id.* at 481-82. When the ex-convict's fingerprints were processed, several months after he began working, the Personnel Department received his "rap sheet," which reflected a substantial criminal past. *Id.* at 482.

Responding to the City's argument for governmental immunity over its decision to retain the ex-convict, the court noted that the "difficulty with the City's contention that it [was] entitled to a cloak of immunity for the discretionary decision to retain [the ex-convict] in his status [was] that there [was] no evidence that, prior to the rape, the City in fact made any such decision or exercised any such discretion." *Id.* at 485. As opposed to making an error in judgment by retaining the ex-convict, there was "no indication that, before

the attack on plaintiff, the City made any effort to comply with its own personnel procedures for employees with criminal records, and no indication that it made a judgment of any sort when it learned that [the ex-convict] both had a criminal record and lied egregiously about it." *Id.* The "key fact [was] that no City employee in the relevant time frame weighed the impact of [the ex-convict's] record on his work assignment or made a judgment that he should be retained." *Id.*

This court must determine whether the City exercised discretion, perhaps properly or improperly, or whether the City failed to exercise discretion at all. Although there are disputed issues of fact regarding what the City defendants knew or should have known regarding the risks plaintiff (and other children) faced during placement with Heartshare, to the extent that there were decisions inviting discretion by the City and its agents, it is not clear from this record that the defendants actually exercised discretion.

For example, regarding plaintiff's transfer to Heartshare, Russo, Clark, and Callagy testified at their depositions that geography and agency performance were considered in transferring cases. This bare testimony does not further elaborate what specifically was considered regarding Heartshare or any other agency that received cases from Concord. At the time of plaintiff's transfer, Heartshare's preliminary

Scorecard had already been released and reflected that Heartshare had the worst score of zero for Frequency of OSI indicated cases.  Whether Russo, Clark, Callagy, or any other City employee involved in the transfer process determined that Heartshare was an appropriate agency to receive additional cases despite a safety record resulting in such a score is not apparent from the record.

It is also not clear whether the City's subsequent decisions involving Heartshare were the result of an exercise of discretion.  Clark explained at her deposition that agency performance was evaluated in overall context and that isolating any individual Scorecard score would not be an appropriate way to evaluate an agency.  She also testified that City did not have a checklist for what would trigger heightened monitoring.  This raises the question of whether the City considered Heartshare's higher incidence of OSI indicated cases, including zero ratings on its Scorecard in 2008, 2010, and 2011 for frequency of indicated cases, and nonetheless decided to continue allowing children to be placed with Heartshare despite that issue or whether Heartshare ignored such data, resulting in a failure to require heightened monitoring, termination of the contract, or some other consequence.

Defendants have not demonstrated in the current record that they actually exercised discretion.  If the defendants are

not precluded from establishing at trial that specific
information was considered regarding Heartshare in its
decisionmaking, they may renew their governmental immunity
defense then.  The court, however, is unlikely to allow the
parties to proffer previously undisclosed evidence.  As stated
above, the court finds that there are disputed issues of fact
and both parties are denied summary judgment on plaintiff's
negligence claims against the City defendants.

**V.  Punitive Damages against City**

The City defendants argue that plaintiff cannot
recover punitive damages against a municipality in a § 1983
action as a matter of law.  City Mem. at 27.  The City
defendants also argue that plaintiff cannot identify any willful
or malicious conduct by individual defendant Russo that would
make punitive damages appropriate in this case.  *Id.* at 27-28.

"Although a municipality itself is immune from a claim
for punitive damages [in § 1983 cases], *see City of Newport v.
Fact Concerts, Inc.,* 453 U.S. 247, 258-68 . . . (1981), that
immunity does not extend to a municipal official sued in his
individual capacity, *see, e.g., Smith v. Wade,* [461 U.S. 30, 55-
56 (1983)]."  *New Windsor Volunteer Ambulance Corps, Inc. v.
Meyers*, 442 F.3d 101, 122 (2d Cir. 2006).  The New York Court of
Appeals has "held that the State and its political subdivisions
are not subject to punitive damages."  *Clark-Fitzpatrick, Inc.*

*v. Long Island R. Co.*, 70 N.Y.2d 382, 386 (1987) (citing *Sharapata v Town of Islip,* 56 N.Y.2d 332 (1982)). The court concludes that plaintiff cannot recover punitive damages against the City under either § 1983 or state law claims.

As to individual defendant Russo, punitive damages may be assessed "in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). An award of punitive damages under New York law is appropriate "where the wrongdoer's actions amount to willful or wanton negligence, or recklessness, or where there is 'a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'" *Chauca v. Abraham*, 30 N.Y.3d 325, 329 (2017) (citing *Home Ins. Co. v. Am. Home Prod. Corp.*, 75 N.Y.2d 196, 203 (1990)). "Such conduct need not be intentionally harmful but may consist of actions which constitute willful or wanton negligence or recklessness." *Home Ins. Co.* at 204 (citation omitted).

"[S]ummary judgment on the issue of punitive damages is inappropriate where there is enough evidence to permit the jury to find that defendants acted with wanton and reckless or malicious intent." *Morales v. Kavulich & Assocs., P.C.*, 294 F. Supp. 3d 193, 199 (S.D.N.Y. 2018). As

discussed above, there is a dispute regarding Russo's involvement in IOC and the development of Scorecard, a system in which an agency could repeatedly score poorly on a measure regarding reports of neglect and abuse without being subjected to any meaningful or serious measures.  Russo also made recommendations to the Commissioner of ACS based upon the work performed by staff in multiple ACS divisions regarding the transfer of cases from Concord to Heartshare, but there is a dispute as to whether safety was considered in this process as part of agency performance.  Because Russo was not granted summary judgment on the § 1983 or state negligence claims and a jury could find in plaintiff's favor, Russo is not entitled to summary judgment on the punitive damages claim.

## VI.   Waived Claims

The City defendants argue that the plaintiff offered no argument in opposition to their motion regarding her failure to train and acquiescence in the use of excessive force claims and that those claims should be deemed abandoned.  City Reply at 1.  "[A] a partial opposition may imply an abandonment of some claims or defenses. . . . Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended."  *Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014).  Because plaintiff did

not raise arguments in opposition to defendants' motion, in contrast to her thorough defense of her other claims, the court finds that plaintiff has abandoned her failure to train and excessive force claims.

## CONCLUSION

For the foregoing reasons, the court: (1) denies plaintiff's motion for summary judgment in its entirety; (2) grants the City defendants' motion as to punitive damages against the City, the failure to train claim, and acquiescence in the use of excessive force claim; (3) denies the City defendants' motion regarding plaintiff's Section 1983 and state law claims and the punitive damages claim against Russo; and denies the Heartshare defendants' motion in its entirety. The parties are directed to file a joint status report regarding this case, as well as the related case *Jewels v. Casner et al.*, Case No. 12-cv-1895, including an update on any settlement discussions, within thirty days of this Memorandum & Order.

**SO ORDERED.**

Dated:    November 12, 2019
          Brooklyn, New York

                              _____
                                        /s/
                              **HON. KIYO A. MATSUMOTO**
                              United States District Judge
                              Eastern District of New York